ELLSWORTH *v.* MASSACAR.

1. EVIDENCE—ASSAULT—PERSONAL INJURIES — TESTIMONY AS TO LOYALTY IMMATERIAL.

   In an action for personal injuries charging conspiracy and assault and battery, where plaintiff testified that defendant and others took him from his home at night and after charging him with disloyalty in connection with his refusal to buy Liberty bonds, contribute to Red Cross and other war funds, etc., assaulted him, causing severe personal injuries, the trial court was not in error in excluding testimony as to the loyalty or disloyalty of plaintiff, although the question had unavoidably crept into the case as *res gestæ* in testimony as to what was done and said at the time of the alleged assault.

2. TRIAL—ARGUMENT OF COUNSEL.

   Argument by plaintiff's counsel, calling attention to what the president and attorney general of the United States said about mob law and reading from a very drastic newspaper article, which was not in evidence or admissible, discussing and quoting from an address by the attorney general in reference to the lynching of a claimed innocent man in another State, *held*, prejudicial error.

3. SAME—DAMAGES—MENTAL SHOCK—FRIGHT.

   Where none of the unlawful acts complained of were directed towards plaintiff's wife or committed in her presence, the trial court was in error in submitting to the jury the question of damages for loss of the wife's services caused by incapacity through shock or fright.

4. PERSONAL INJURIES—DAMAGES—MENTAL SHOCK—FRIGHT.

   There can be no recovery for injuries resulting wholly from mental shock or fright not accompanied by any physical injury.

Error to Sanilac; Beach (Watson), J. Submitted April 27, 1921. (Docket No. 93.) Decided October 3, 1921.

Case by Charles Ellsworth against Albert Massacar for conspiracy and assault and battery. Judgment for plaintiff. Defendant brings error. Reversed.

*Moore & Wilson,* for appellant.

*Wilford Macklem (Thomas Wellman,* of counsel), for appellee.

STEERE, C. J. Plaintiff is a farmer 62 years old residing with his wife on a 40-acre farm in the township of Fremont, Sanilac county. As a prelude, it may be noted that events out of which this action arose were contemporaneous with war activities in a Liberty loan drive in the spring of 1918, touching which plaintiff relates that a neighbor named Doane, described by him as "the worst enemy I have in the world," called upon him accompanied by another neighbor about a week before May 5th, and solicited him to subscribe for a Liberty bond which he refused to do, telling Doane he would take none from him. On May 5, 1918, shortly after midnight, while plaintiff and his wife were at home and retired for the night, he was aroused by some one who came to his bedroom window and called him, asking for help to get an automobile out of the ditch near by and for poles to pry it up, or a team. He responded, gave the parties some directions where to find poles and blocks, put on his clothing and overshoes, took his lantern and went out at his back door, where he met one of them who had a pole and they went down the road some 12 or 14 rods to where the automobile was claimed to be in the ditch, but was not. · Another automobile just then came down the road with people in and he was suddenly seized by several men who pulled a bag over his head, put him into the bottom of an automobile where he felt a rope under him and drove to a piece of woods about a mile from his home, where

he was received by a gathering of considerable size, some of them being masked, and subjected to a course of treatment with harrowing details as he relates them.

It appears from his testimony, in the main undisputed, that he was there provided with an escort equipped with a rope and firmly led in the direction of a convenient tree, with accompanying intimations of the fate he was about to meet if he did not manifest a change of heart and recant on certain manifestations of disloyalty imputed to him and, as he states, charging him with being pro-German, having found fault with the bread people were obliged to eat during these war times, failure to contribute his share for Red Cross, Liberty bonds, etc. He denied disloyalty, stated he had bought a Liberty bond and made other protests resulting in a proposition by some one that he be allowed to take the oath of allegiance and promise loyalty thereafter. He was then in a frame of mind to accept the proposition promptly, and an attorney from the near-by town of Croswell, who happened to be there in the interest of good order, as suggested, was called upon to conduct the ceremony. He testified that "angle of the situation suited" him as it appeared to be "a very favorable way of settling up the question," and he proceeded to administer the oath of allegiance with full ceremony, plaintiff being required to kneel and repeat it after him. He took pains to elaborate the oath of allegiance beyond mere fidelity to the Constitution of the United States and went down the line through varying governmental and other public activities, "right on down to the school board" and the "war board in particular," as he testified. At conclusion of the oath, to which plaintiff readily responded, he was required to and did kiss an American flag which was ready and put before him. The function being thus happily ended, plaintiff

215—Mich.—33.

was returned in one of the automobiles to his own fireside.

As to the details of plaintiff's treatment by those who had him in charge, the testimony is in grave dispute. He claims serious injury resulted to him from the manner of his treatment, both mentally and physically—that he was cursed, kicked and struck, violently thrown into the automobile, blinded by the bag over his head, and was roughly man-hauled generally, sustaining various physical injuries, one being a severe and lasting wrench of his spine; that defendant, who was admittedly at the gathering, was in the car which kidnapped him, acted as a leader, cursed him, struck him with a piece of board, and at one time called to the others to "Get the ropes." This action in tort is planted against him to recover damages for the injuries so claimed to have been inflicted.

The evidence of the defense, both by citizens who were present, but not shown to have taken an active part, as well as defendant and others accused of overt acts, is that plaintiff was not struck, roughly handled or physically injured; that only sufficient force was used to safely but firmly convey him to the place of meeting and escort him through the ceremonies; that, contemporaneous with the theatrical display in which no actual violence was resorted to, plaintiff proclaimed his loyalty and promptly consented to manifest it in the manner proposed, after which he was considerately returned to his home, and he in fact suffered no injuries, unless to his feelings. Those issues were left to the jury. Plaintiff recovered a verdict and judgment against the defendant in the sum of $2,000.

Numerous errors are assigned, the principal ones being that the court erred in excluding offered testimony of defendant to show plaintiff's disloyalty, refusal to contribute to the Red Cross and other war

funds, etc.; in refusing to direct a verdict for defendant; in permitting plaintiff's counsel to use a newspaper and read from it an article on the subject of mob law; in permitting testimony as to the loss by plaintiff of the services of his wife resulting from the shock she sustained by reason of the event and in stating the measure of damages to the jury.

Not only was conspiracy charged in the declaration but assault and battery. The conflicting testimony clearly made a case for the jury under the charges contained in plaintiff's declaration.

The question of loyalty or disloyalty, citizenship or non-citizenship were in no sense proper issues in the case. The court consistently so ruled during the trial and very clearly instructed the jury upon the subject. It unavoidably crept into the case as *res gestæ* through the testimony as to what was done and said at the time of the alleged tortious acts, largely that of defendant. Aside from that all offered evidence of either side on the subject was excluded by the court. Of this the court said to the jury in part:

"Now at the outset there crept into this case from the opening statement of plaintiff's counsel and subsequently by efforts to combat that and the testimony of the plaintiff, question of loyalty or disloyalty. I say to you at the outset that that question cuts no figure in the law or in the disposition of this case so far as the law is concerned and so far as the court is concerned. The wrong claimed here is a trespass to the person of the plaintiff—an assault, the claim being that he was forcibly taken from his premises, * * * Now I say to you as a matter of law that whatever words may have been used or whatever language may have been used by Mr. Ellsworth previous to that time would not be an excuse for that act of these persons toward him, it can offer no excuse for personal violence. And on that same question there has been run into the case the question of Mr. Ellsworth's citizenship and the defendant's non-citizenship. That does not cut any figure. Nothing should

be charged against either or given in favor of either because he is a citizen or non-citizen."

In his argument to the jury plaintiff's counsel, when he was declaiming against lynch law and mob violence, referred to the recent lynching of a man in Indiana by a drunken mob for alleged seditious utterances and their indictment for murder, and was proceeding with a newspaper in his hand when defendant's counsel objected and the court said:

"The jury will understand that any illustration given by Mr. Macklem of what he called mob law is to be taken as his own statement and not as evidence in the case. There is no evidence in this case."

Plaintiff's counsel then proceeded, called attention to what the "president and our attorney general say about this mob law," saying in reply to an objecting question by defendant's counsel, "I am just going to read a comment upon what the attorney general said, it is not law," to which the court said "all right."

Counsel then read a very drastic newspaper article entitled *"Stop Mob Rule,"* discussing and quoting from an address by the attorney general, in which his text was largely taken from the lynching of one Robert Prager, in Illinois, thought to have been guilty of no offense, and very severely condemning lynch law in scathing terms.

By pursuing this ingenious course counsel brought to his assistance the influence of the president and attorney general of the United States with a powerful aiding argument of the latter which, though made of general application, dealt with a particularly infamous case of lynching an assumed innocent man by a drunken mob in the State of Illinois. This we think was prejudicial to the defense, and considering the evidence in the case as a whole is indicated to have been reflected in the verdict. The newspaper article was not in evidence or admissible. Its use by plain-

tiff's counsel in his closing argument was reversible error. *Greissing* v. *Oakland Motor Co.*, 204 Mich. 116.

Plaintiff made claim for loss of services by his wife, who he claimed was made ill by the shock and excitement to her from what occurred and exposure in going out to ascertain what became of him, and to aid him if she could as she testified she did. Of this the court instructed the jury:

—"and determine whether his wife was shocked or excited, as claimed, to the extent that she was incapacitated for her usual work and determine for how long and what the value of her services was for that time."

No claim is made that defendant or any member of his party was in plaintiff's house or saw or did anything to her, or any unlawful action on their premises. She testified that after the parties left the house she went out and saw some automobiles down the road and went back, got the gun, loaded it and started to a neighbor's. Of her proximity to the disturbances complained of she said:

"When I got to the corner I listened, I heard him say, 'you ought to be ashamed all of you men, to get an old man like me out here.' I did not stop to listen any more. I went on; I knew he was alive; I was afraid I would not have any show down amongst those men if I followed them up with the gun. I was excited and scared and when I got to Mr. Allen's house I rapped on the door, my hair was down and I was crying."

Of her condition when testifying she said:

"I am nervous and weak all the time and I don't sleep good at night; any little excitement I get awful nervous. All of which is caused by the excitement and being scared on May 5, 1918."

It was in consequence of such condition that she and her husband testified to her inability to work as before. Certainly plaintiff could not recover for

mental shock or suffering to his wife. *Hyatt* v. *Adams*, 16 Mich. 180.

None of the unlawful acts complained of were directed towards her or committed in her presence. It is a general rule of law that there can be no recovery for injuries resulting wholly from mental shock or fright not accompanied by any physical injury. Baldwin on Personal Injuries (2d Ed.), § 431; *Nelson* v. *Crawford*, 122 Mich. 466.

For the foregoing reasons the judgment must be reversed and a new trial granted, with costs to defendant.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.